

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*Jacob K. Javits Federal Building*
*26 Federal Plaza, 37ᵗʰ Floor*
*New York, New York 10278*

September 27, 2024

**BY ECF**
The Honorable Katherine Polk Failla
United States District Court Judge
Southern District of New York
40 Foley Square
New York, New York 10007

     **Re:** *United States v. Pierre Girgis*, 22 Cr. 6 (KPF)

Dear Judge Failla:

     The Government respectfully submits this letter in advance of the October 15, 2024 sentencing of Pierre Girgis, and in response to his sentencing submission ("Def. Mem."). While the Government exercised its discretion in arriving at the plea in this matter in light of mitigation presented by the defense, as described in more detail below, Girgis's conduct still risked harming the nation's security; as he recognizes in his submission, Girgis "arrogantly believed that his work . . . was the key to stomping out Islamist extremism and terrorism" but now "fully accepts responsibility for working with foreign officials on matters affecting public safety and security . . . with disregard for the implications." (Def. Mem. Ex. A at 12). The Government, therefore, respectfully requests that a sentence of three years probation would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

**I.   Factual Summary**

    **A.   Girgis Monitors and Investigates Opponents of the Egyptian Government as Part of His Work for Egyptian Officials**

     In 2016, after developing long-term relationships with officials of the Arab Republic of Egypt ("Egypt"), Girgis began monitoring—both on social media and in person—protest activity contra Abdel Fattah el-Sisi, the current president of Egypt, by a group of activists, and reporting their activities to Egyptian officials. Based on their encrypted communications, the Egyptian officials directing Girgis were particularly focused on two New York-based Egyptian anti-Sisi activists ("Activist-1" and "Activist-2"), regularly exchanging messages about the activities of Activist-1 and Activist-2, as well as a protest group to which they both belonged as reflected in their social media activity ("Protest Group-1").

     On March 31, 2017, for example, Protest Group-1 posted on Facebook a flyer for an April 3, 2017 protest in Washington, D.C. against el-Sisi's upcoming visit to the White House. On April 1, 2017, Mohamed Ramadan ("Ramadan"), an Egyptian official employed at the Egyptian

Consulate in Manhattan sent Girgis a link to a video that Activist-2 had posted of himself on Facebook. In response, Girgis wrote, "encouraging violence on U.S. soil. I have contacted our beloveds and they are working on him," an apparent reference to Girgis's contacts in the New York City Police Department ("NYPD"), with whom Girgis communicated before and after the el-Sisi protest. Girgis also received messages about the upcoming protests from Mohamed Hassan Elsayed ("Elsayed"), an Egyptian official working at the Egyptian Mission to the United Nations in New York. Girgis stored Elsayed's number in his phone as "Mohamed Hassan Egyptian Mission." On April 2, 2017, the day before the el-Sisi White House visit, Elsayed messaged Girgis via encrypted application, sending several photographs of Activist-1 and Activist-2 together on a bus destined for Washington, D.C.

On April 3, 2017, the day of the White House visit, Girgis traveled to Washington, D.C., where he monitored the protests in person. During the protests, violence broke out. As reported in public press, anti-Sisi protesters assaulted a well-known Egyptian media personality who was part of el-Sisi's media delegation to the United States. The perpetrators were arrested by the Washington, D.C. Metropolitan Police Department.[1] In the aftermath of this assault, Girgis received information from Egyptian officials and passed the information to Girgis's NYPD contacts, in an effort to prompt the NYPD to take action against the assailants. For example, Girgis received photographs and videos of the assailants from Ramadan and Elsayed, which had been mined from both preexisting social media and photographs from the assault, and sent that information to multiple members of the NYPD.

### B. Girgis Requests That NYPD Officers Obtain Non-Public Information for Egyptian Officials

On at least three separate occasions following this trip to Washington, D.C. to monitor and report to Egyptian officials on the anti-Sisi protests, Girgis requested non-public information from NYPD officers concerning individuals of interest to Egyptian government officials.

On April 8, 2017—approximately one week after the assault and arrests in Washington, D.C.—Girgis sent two phone numbers to Ramadan, and then a half hour later sent the same numbers to a particular NYPD officer ("Officer-1") followed by the message, "Ramdan." Officer-1 responded "ok." On the next day, April 9, 2017, Ramadan sent Girgis what appears to be a still from a security camera showing an unknown individual on the street, which Girgis promptly forwarded to Officer-1. Officer-1, responding to Girgis's message from the prior day providing the two phone numbers, wrote, "both numbers are fake." Girgis responded, "thanks for looking into it. hope nothing bad happen here." Officer-1 assured him, "nothing gonna happen."

Girgis next requested non-public information from the NYPD in September 2017. On September 8, 2017, Activist-1 posted on Facebook a flyer for a "huge protest against Sisi's visit to the United Nations." Three days later, on September 11, 2017, Girgis sent Officer-1 an encrypted message containing a screenshot of Activist-1's Facebook post with the flyer, which

---

[1] *See* https://pressfreedomtracker.us/all-incidents/egyptian-talk-show-host-slapped-back-neck/; https://english.alaraby.co.uk/english/news/2017/4/4/egypt-journalist-attacked-by-anti-sisi-protesters-in-washington-streets.

also indicated that Activist-1 would attend the event. Officer-1 responded, "already handled," to which Girgis replied, "Can you tell me what steps you to[o]k? The dep I mean," referring to the "department," *i.e.*, NYPD. In response, Officer-1 wrote, "when we talk." The next day, on September 12, 2017, Girgis asked Officer-1, via encrypted message, for a list, to which Officer-1 responded, "What list?" and Girgis clarified, "protesters list." Officer-1 wrote to Girgis, "I don't think they will give it to us."

Girgis made a third request for non-public information from the NYPD on November 28, 2017. That day, Elsayed sent Girgis a picture of a photo identification card of a particular Egyptian national ("Egyptian-1"). According to NYPD records, on November 22, 2017, Egyptian-1 had been arrested for touching multiple victims' buttocks without permission on a Manhattan street. On November 28, 2017—the day of Elsayed's message—Egyptian-1 was released. Upon receiving the identification card, Girgis promptly forwarded it by encrypted message to Officer-1 and three other NYPD officers ("Officer-2," "Officer-3," and "Officer-4"). Approximately two hours later, Officer-1 responded, "Thank u." Officer-2 responded, "I need a date of birth on him," to which Girgis responded, "i know he lives in queens," prompting Officer-2 to reply, "Without it I can't." Girgis, upon receiving Officer-2's response, messaged Elsayed, "Mohamed i need his date of birth," to which Elsayed replied, "I'll try to get it." Officer-4 replied, "Do u have date of birth" and, according to NYPD records, searched at least one NYPD database for Egyptian-1's name. Officer-4 later responded to Girgis, "Can't find anything in the system[.] Give an address or DOB."

## C. Egyptian Official Confirms Girgis's Status as an Egyptian Agent Working at the Egyptian Government's Direction

Ezzat Mokhtar Farag Morsy ("Mokhtar"), an Egyptian officer with the Egyptian Administrative Control Authority ("ACA") expressly discussed with Girgis his value to the ACA as its agent. In particular, in an encrypted message exchange between Girgis and Mokhtar on May 7, 2018, Mokhtar wrote Girgis in apparent anger over Girgis's recent contact with an Egyptian intelligence service (*i.e.*, a different branch of the Egyptian government than the ACA). In the messages, excerpted below, Mokhtar confirmed that Girgis was a source belonging to the ACA whose assistance to the ACA had been reported to government officials in Egypt, prompting Girgis to repeatedly apologize for his perceived lack of loyalty and to reaffirm his commitment to serving Mokhtar and the ACA.

Girgis:      Can I call you?

Mokhtar:   We have our own secrets, and I had warned you. This is the biggest mistake Pierre, as it is not possible to open with all the agencies. I'm letting you open with us only. Everything I have stated has been written and sent to Egypt. All this talk has been written and sent to Egypt . . . . Seriously, you are humiliating me, you have no idea what can happen. This way the good things you do, you ruin in a second. I'm the one to be humiliated because you do not listen to my words. . . . I had warned you, and you insist on opening with the Mukhabarat.[2] This way you are hurting me . . . . Really I'm very, very sad. Because you do a

---

[2] "Mukhabarat" is the generic Arabic word used for intelligence agencies.

lot of good things, but you ruin them in a second, not just that, you are also hurting me

. . .

Girgis:     I'm sorry

Mokhtar:  You don't listen to me. He asked you and tricked you because he wanted to send it, and you fell and let him know. Pierre you supposed to say, I don't know, I did not do. You hurt me Pierre.

Girgis:     I'm sorry, the last thing I do is to hurt you, I will pull out quietly

. . .

Mokhtar:  I do for you this and that. They want sources for themselves, and you have become an important source for them to collect information. I had warned you.

Girgis:     I know and I see and I learn from you. But I don't understand who wants, uhh and when he asked me if he can send a letter I understood that he wants to help.

Mokhtar:  Now you have seen, I hope, I hope you learn.

Girgis:     But it will not be repeated again.

**D.  Girgis Arranges a Meeting Between Egyptian ACA Officials and NYPD Leadership**

As part of his service to ACA and efforts to further Egyptian interests in the United States, Girgis worked to arrange a meeting between ACA officials and U.S. law enforcement in early 2019. In preparation for these meetings, Mokhtar gave Girgis explicit instructions on what he should be doing to coordinate those meetings. During a call on March 8, 2019, an excerpt from a draft transcript of which is below, Mokhtar directed Girgis as follows:

Girgis:     Tell me what you want me to do.

Mokhtar:  You relationship with him is very good?

Girgis:     My relationship? With whom, with [an NYPD Inspector]? I have very good relationship with [the NYPD Inspector].

Mokhtar:  We want to you to ask him for something. We want you to find out if there are any police training/meeting happening in Manhattan in the coming days, and if so, who are the people in charge of these trainings? We would like to attend.

Girgis:     You told me don't push?

| Mokhtar: | I told you I would talk to you first. If not, I will talk to [another NYPD officer ("Officer-5")] and see if he could get us an appointment with his man. |
| Girgis: | Don't talk to [Officer-5] because I already talked to his man |
| Mokhtar: | What did the man tell you? |
| Girgis: | When I met them in March, he told me neither him nor the NYPD Commissioner would be available during this time. I will reach back out to the Lieutenant whom I spoke with. |
| Mokhtar: | We want to come to see what arrangements they have, or what kind of cooperation they offer us these days. |
| Girgis: | So, shall I start talking to the Lieutenant again? |
| Mokhtar: | Yes. Talk. |
| Girgis: | I don't want to mix things together though, because if you talk to [Officer-5], things will get messed up. |
| Mokhtar: | That is why I am asking you now. |
| Girgis: | I already met and spoke with [Officer-5]'s manager. |
| Mokhtar: | [Officer-5] asked me if we need anything from them, that is why I asked you what you are going to do? |
| Girgis: | What you want me to do? I told them that I met with the [Officer-5]'s top manager, the chief of the whole unit. . . . I went in, we sat together, I gave him the things, I told him about you and sent him the information. |
| Mokhtar: | Make follow up, Ok? |
| Girgis: | Ok. |

As instructed, Girgis then arranged the meeting, exchanging multiple emails with NYPD officials. On March 15, 2019, Girgis attended the meeting he had arranged at the NYPD, which involved ACA officials and high-level NYPD officials, as well as—unbeknownst to Girgis—an FBI employee. Representing the ACA were Mokhtar, who identified himself as Chief of Staff of the ACA; another individual who identified himself as an ACA investigations group leader; and a third ACA official, who identified himself as the head of secret service of the ACA. During the meeting, Girgis acted as a translator for the ACA officials, who discussed collaborating with the NYPD. The NYPD officials, having been made aware by FBI of its investigation into Girgis's

activities, agreed that collaboration was important but said that further requests for information or collaborative meetings had to be officially requested through the NYPD's External Affairs office.

### E. Girgis Pushes the NYPD to Prosecute Activist-2

In April 2019, as Girgis and his Egyptian handlers continued their efforts to disrupt lawful protest activities, Girgis acted as an intermediary between Egyptian officials and another NYPD officer ("Officer-6") to further an investigation into Activist-2.

During an exchange of encrypted messages with Officer-6, Officer-6 provided Girgis with Activist-2's bank account number, phone number, and bank account activity, and asked Girgis to "keep it confidential." Girgis passed this information to Egyptian officials Ramadan and Elbehiry. During the exchange, Girgis also made suggestions to Officer-6 about how Activist-2 could be criminally charged, such as "by any chance can you check if he is on Medicaid or if he's taking welfare . . . you should it will help your investigation. charge of committing fraud by submitting false statements." Officer-6 later wrote, "I don't know how u going to get info, but if u can try not to mention it's law enforcement related. But most important I want to know who is he sending money to in Egypt." Girgis responded, "no worries. I will get you the info soon." Later that evening, Girgis asked Ramadan, "if you have pictures with [Activist-1] and [Activist-2] or any of the people you know plz send it to me. I want them to link a relate everyone," indicating an effort by Girgis to influence Officer-6's investigation and expand the targeting to include as many anti-Sisi protesters as possible. Several days later, another Egyptian official sent to Girgis encrypted messages with the full names of Activist-2 and his wife, along with an "id#" for Activist-2, which Girgis forwarded to Officer-6. Girgis did not succeed in having charges filed against Activist-2.

### F. Girgis Distributes Conscription Information on Behalf of Egyptian Official

On or about September 18, 2019, Girgis transmitted by WhatsApp a flyer on behalf of an Egyptian consular official, to an individual also located in New York. The flyer, which was prepared by the Egyptian Consulate in Manhattan, explained Egyptian expatriates' conscription obligations. As Girgis acknowledged in connection with his plea, he expected that, once he sent the document, it would be shared widely, including within the Coptic community in New York. Girgis did not conspicuously note on the document that it was being shared on behalf of the Egyptian government by one of its agents.

## II. Procedural History

On January 6, 2022, a grand jury in this District indicted Girgis, charging him with acting as an agent of a foreign government without notifying the Attorney General, and conspiring to do the same, in violation of Title 18, United States Code, Sections 951, 371, and 2. On August 14, 2024, Girgis pled guilty to a superseding information charging him with a misdemeanor violation of failing to label informational materials distributed for or in the interest of Egypt, in violation of Title 22, United States Code, Sections 614(b) and 618(a)(1). At the plea, the Court waived the pre-sentence report at Girgis's request. The United States Sentencing Guidelines do not apply to the offense of conviction and Girgis, in his submission, requested a sentence of time served (*see* Def. Mem. at 1).

## III. Discussion

### A. The Court Should Impose a Sentence of Probation

The Government respectfully submits that a sentence of three years of probation would be sufficient, but not greater than necessary, to reflect the nature and seriousness of the offense; promote respect for the law; provide just punishment for the offense; and afford adequate deterrence to criminal conduct, as required by 18 U.S.C. § 3553(a).

While the Government recognizes the mitigating factors identified by the defense, and offered the disposition referenced above in light of that mitigation, Girgis's conduct was nonetheless serious and risked the precise dangers intended to be addressed by the prohibitions in Section 951 and the Foreign Agents Registration Act. Even accepting that Girgis was not motivated by financial gain, as Girgis acknowledges, "he had crossed the line from being a mere concerned civilian to someone who could be relied on to help the Egyptian government accomplish its political goals in the United States." (Def. Mem. Ex. A at 2). Irrespective of whether Girgis personally shared those political goals, Girgis assisted Egypt in a way that concealed Egyptian interests in U.S. law enforcement. Such unencumbered foreign interference on U.S. soil raises serious national security concerns.

Take, for example, Girgis's targeting of anti-Egyptian activists. By helping Egyptian officials gather information about the activists, Girgis allowed a foreign power to intrude on protected First Amendment activities within our borders. More significantly, however, by providing Egyptian information to the NYPD about the activists, he allowed the Egyptian government to influence U.S. law enforcement in a manner unattributable to Egypt, at least officially. Such laundering of information, if unchecked, could lead U.S. law enforcement to unwittingly do the bidding of a foreign power without knowing whether the information was provided for ulterior motives or even true. While these risks should have been obvious, Girgis undertook the targeting of anti-Egyptian activists anyway, apparently for reasons that included, by his own admission, a need to "feel important." (Def. Mem. Ex. A at 22). As Girgis recognizes:

> He arrogantly believed that his work to transcend the bureaucracy and facilitate unofficial relationships and connections was the key to stomping out Islamist extremism and terrorism. Mr. Girgis fully accepts responsibility for working with foreign officials on matters affecting public safety and security, and for doing the bidding of these officials with disregard for the implications.

(Def. Mem. Ex. A at 12).

Because Girgis ignored these risks to U.S. "public safety and security," the Court should impose a meaningful sentence of probation. Such a sentence is appropriate given the potential harm from Girgis's actions and will ensure that others contemplating such conduct—irrespective of their motives—think twice before doing so. In the end, even after considering mitigation, Girgis's attempts at self-aggrandizement through playing diplomat merit sanction.

## IV.  Conclusion

For the reasons set forth above, the Government respectfully submits that a sentence of three years probation would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing in this case.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: _____/s/_____
Kyle Wirshba / Elinor Tarlow / Sarah Kusner
Assistant United States Attorneys
(212) 637-2493

cc:  Defense Counsel (by ECF)